## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

Sal Rivera, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Walmart Inc.,

Defendant

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.      Walmart Inc. ("Defendant") manufactures, labels and sells apple juice promoted as containing "Vitamin C," which fails to disclose chemical preservatives, under the Great Value brand ("Product").




## I.   CONSUMERS VALUE FOODS WITHOUT CHEMICAL PRESERVATIVES

2.    Preservatives are ingredients added to food that are capable of and tend to prevent or slow its deterioration.

3.    This includes maintaining or improving safety, freshness, nutritional value, taste, texture and appearance.

4.    These functions can be achieved through natural preservatives like sugar, salt, vinegar, and spices, or artificial preservatives like ascorbic acid, citric acid, benzoate of soda, salicylic acid, and sulfur dioxide.

5.    For over a century, consumers have sought food without chemical preservatives.

6.    In response to consumer outcry based on the unregulated environment where dangerous substances were added to the nation's food supply, the Pure Food and Drug Act of 1906 required disclosure of chemical preservatives to inform purchasers about the contents of what they were buying.

7.    This requirement was maintained when the Federal Food Drug and Cosmetic Act ("FFDCA") was enacted. 21 C.F.R. § 101.22(a)(5), 21 C.F.R. § 101.22(c).

8.    These rules were adopted by every state so all consumers could make informed decisions about the foods they buy.

9.    Consumer opposition to preservatives is just as strong today as a hundred years ago, confirmed by research from Nielsen and Mintel indicating that almost ninety percent of Americans are willing to pay more for healthier foods, understood as without synthetic preservatives.

10.    That the use of undisclosed chemical preservatives remained prevalent and significant to consumers was affirmed by the International Food Information Council ("IFIC") and Food and Drug Administration's ("FDA") advisory that the public to look at the "Names Found on Product Labels" via the ingredient list for ingredients including "[A]scorbic acid, citric acid

2

[and] sodium benzoate," among other chemical additives.[1]

11.    That reviewing a product's ingredients should be sufficient to tell consumers of the use of chemical preservatives is based on the requirement that "[A] food to which a chemical preservative(s) is added shall [] bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'." 21 C.F.R. § 101.22(j).

## II.    ASCORBIC ACID FUNCTIONS AS PRESERVATIVE

12.    The Product's ingredient list includes "Ascorbic Acid (Vitamin C)."



**INGREDIENTS:** APPLE JUICE FROM CONCENTRATE (WATER, APPLE JUICE CONCENTRATE), ASCORBIC ACID (VITAMIN C).

13.    Ascorbic acid is a chemically modified form of vitamin C, used in apple juice as a preservative. 21 C.F.R. § 182.3013; 7 C.F.R. § 205.605(b).

14.    Even though apple juice is moderately acidic with a relatively low pH level between 3.35 and 4, the addition of the chemical preservative of ascorbic acid is necessary for multiple reasons relating to preventing and slowing its deterioration.

---

[1] Overview of Food Ingredients, Additives & Colors, Apr. 2010.

A. <u>Acidulant</u>

15.    Though The Food Additive User's Handbook described ascorbic acid as a "typical acidulant," which enhances apple juice's tart and sweet taste, it is also one of the most commonly used preservatives.

16.    Even though the Product is pasteurized, foodborne pathogens can survive pasteurization.

17.    Ascorbic acid increases the acidity of the Product, lowering its pH, making apple juice less prone to microbial spoilage from bacteria, yeasts, and molds.

18.    The low pH of ascorbic acid helps prevent microbial growth in the Product, thereby preventing spoilage and preserving freshness.[2]

19.    The addition of ascorbic acid means that if any microorganisms survive, they will be neutralized, so that the Product will be preserved by being stable and consumable for a longer period after it is first made.

B. <u>Chelating Agent</u>

20.    Ascorbic acid is a chelating agent in the Product to remove traces of heavy metals.

21.    The removal of traces of heavy metals prevents its premature oxidation.

22.    This increases the Product's shelf life and helps to maintain its original taste, color and appearance.

C. <u>Microbial Agent</u>

23.    Ascorbic acid is an antimicrobial agent in the Product.

24.    The addition of ascorbic acid limits the growth and toxin production of molds such

---

[2] Kirk-Othmer Food and Feed Technology

as *Aspergillus parasiticus* and *A. versicolor*, which have been shown to exist in apple juice.

D.  Buffering Agent

25.    Ascorbic acid is as a buffering agent in the Product.

26.    A buffering agent helps to maintain a constant pH, preventing batch-to-batch inconsistencies in the Product.

27.    Although buffers can be weakly acidic or weakly basic, ascorbic acid is an acidic buffer.

28.    The result of a constant pH is a product which will last longer on the shelf than a product with a variable pH, because it will be more stable and less prone to microbial spoilage.

E.  Antioxidant

29.    Ascorbic acid is a common antioxidant additive.

30.    By definition, antioxidants are oxygen scavengers and prevent oxidation, preserving the Product.

31.    Ascorbic acid reverses oxidation of apple juice, preventing the Product from spoiling prematurely, so that it can remain consumable and shelf-stable for a longer period of time after being made.

F.  Effects on Color

32.    Ascorbic acid prevents discoloration by, among other means, reversing the oxidation of apple juice constituents.

33.    For this reason, ascorbic acid is known as an anti-browning agent, preserving the naturally light color of apple juice for a longer period of time after it was first made.

34.    The result is that the Product can be successfully sold to consumers for longer periods

of time because it remains visually appealing after the point which it would not be in the absence of ascorbic acid.

Jurisdiction and Venue

35.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

36.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

37.     Plaintiff is a citizen of Florida.

38.     Defendant is a citizen of Delaware and Arkansas.

39.     The class of persons Plaintiff seek to represent includes persons who are citizens of different states from which Defendant is a citizen.

40.     The members of the classes Plaintiff seek to represent are more than 100, because the Product has been sold with the representations described here from dozens of Defendant's retail locations and website, across the States covered by the proposed classes.

41.     Venue is in this District with assignment to the Tampa Division because a substantial part of the events or omissions giving rise to these claims occurred in Hillsborough County, including Plaintiff's purchase and use of the Product, reliance on the representations and omissions, and/or subsequent awareness they were false and misleading.

Parties

42.     Plaintiff Sal Rivera is a citizen of Tampa, Florida, Hillsborough County.

43.     Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Arkansas, Benton County.

44.     Walmart is an American multinational retail corporation that operates a chain of over

6

5,000 supercenters throughout the nation, selling everything from furniture to groceries.

45.     While Walmart sells leading national brands, it also sells a large number of products under one of its private label brands, Great Value.

46.     Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

47.     Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

48.     Products under the Great Value brand have an industry-wide reputation for quality.

49.     In releasing products under the Great Value brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

50.     Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

51.     That Great Value branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

52.     Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

53.     A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

54.     Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand as a whole.

55.     The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Great Value products.

56.    Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Defendant's stores, at locations such as 1505 N Dale Mabry Hwy, Tampa, FL 33607, between 2021 and 2023, among other times.

57.    Plaintiff believed and expected the Product did not contain preservatives because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the packaging.

58.    Plaintiff seeks to purchase beverages without chemical additives because he believes these ingredients are potentially harmful, made through unnatural processes with synthetic ingredients, and mean a product is less fresh.

59.    Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

60.    As a result of the false and misleading representations, the Product is sold at premium price, approximately no less than $1.98 per 64 FL OZ, excluding tax and sales.

61.    Plaintiff bought the Product at or exceeding the above-referenced price.

62.    Plaintiff paid more for the Product, would have paid less or not have purchased it had he known the representations and omissions were false and misleading.

63.    The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

64.    Plaintiff chose between this Product and others represented similarly, but which did not misrepresent or omit their attributes, requirements, instructions, features, and/or components.

65.   Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance its representations are consistent with its abilities, attributes, and/or composition.

66.   Plaintiff is unable to rely on the labeling and representations not only of this Product, but other apple juices, because he is unsure whether those representations are truthful.

67.   If Defendant's labeling were to be truthful, Plaintiff could rely on the labeling of other brands of apple juice.

<u>Class Allegations</u>

68.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Alabama, Georgia, Mississippi, and Tennessee who purchased the Product during the statutes of limitations for each cause of action alleged.

69.   Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiff and class members are entitled to damages.

70.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

71.   Plaintiff is an adequate representative because his interests do not conflict with other members.

72.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

73.   Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest relative to the scope of the harm.

74.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

75.    Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Florida Deceptive and Unfair Trade Practices Act,</u>
<u>Fla. Stat. § 501.201, <i>et seq.</i></u>

76.    Plaintiff incorporates by reference all preceding paragraphs.

77.    Plaintiff purchased the Product and did not expect chemical preservatives, because the packaging failed to disclose this fact.

78.    Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

79.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

80.    The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

81.    Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose</u>
<u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <i>et seq.</i></u>

82.    The Product was manufactured, identified, marketed, and sold by Defendant and

expressly and impliedly warranted to Plaintiff that it did not contain chemical preservatives, because the packaging failed to disclose this fact.

83.     Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

84.     Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as juice without chemical preservatives, and developed its marketing and labeling to directly meet their needs and desires.

85.     The representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it did not contain chemical preservatives, because the packaging failed to disclose this fact.

86.     Defendant's representations affirmed and promised that the Product did not contain chemical preservatives, because the packaging failed to disclose this fact.

87.     Defendant described the Product so Plaintiff believed that it did not contain chemical preservatives, because the packaging failed to disclose this fact, which became part of the basis of the bargain that it would conform to its affirmations and promises.

88.     Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

89.     This duty is based on Defendant's outsized role in the market for fruit juice as custodian of the Great Value brand, known for its high-quality products, honestly marketed to consumers.

90.     Plaintiff recently became aware of Defendant's breach of the Product's warranties.

91.     Plaintiff provided or provides notice to Defendant, its agents, representatives,

retailers, and their employees that it breached the Product's warranties.

92. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, including regulators and competitors, to its main offices and through online forums.

93. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

94. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it did not contain chemical preservatives, because the packaging failed to disclose this fact.

95. The Product was not merchantable because Defendant had reason to know the particular purpose for which it was bought by Plaintiff, because he expected it did not contain chemical preservatives, because the packaging failed to disclose this fact, and he relied on its skill and judgment to select or furnish such suitable product.

Negligent Misrepresentation

96. Defendant had a duty to truthfully represent the Product, which it breached.

97. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for high-quality products, honestly marketed to consumers.

98. Defendant's representations regarding the Product went beyond the specific representations on its packaging and labels, as they incorporated its extra-labeling promises and commitments to quality it has been known for.

99.    These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

100.    The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

101.    Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

<u>Fraud</u>

102.    Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it did not contain chemical preservatives, because the packaging failed to disclose this fact,

103.    Defendant's attempt at compliance with the disclosure requirements, evinced through labeling "Ascorbic Acid (Vitamin C)" indicate knowledge of what was required when using chemical preservatives but fails to tell purchasers the preservative function of ascorbic acid and/or its classification as a preservative.

104.    The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

<u>Unjust Enrichment</u>

105.    Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.   Certifying Plaintiff as representative and the undersigned as counsel for the classes;

2.  Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.  Awarding monetary, statutory and/or punitive damages and interest;

4.  Awarding costs and expenses, including reasonable attorney and expert fees; and

5.  Other and further relief as the Court deems just and proper.

Dated:   March 20, 2023

Respectfully submitted,

/s/ Alexander J. Korolinsky
Florida Bar No.: 119327
AJK Legal
1580 Sawgrass Corporate Pkwy Ste 130
Sunrise FL 33323
(877) 448-8404
korolinsky@ajklegal.com

Sheehan & Associates, P.C.
Spencer Sheehan (*Pro Hac Vice* forthcoming)
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com